**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sherly Lande, | No. CV-23-00946-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Intel Corporation, et al., | |
| Defendants. | |

Pending before the Court is Defendant Intel Corporation's ("Intel" or "Defendant") Motion for Summary Judgment (Doc. 45) and accompanying Statement of Facts (Doc. 46 ("SOF")). Plaintiff Sherly Lande ("Plaintiff") filed a Response (Doc. 54) and her Controverting Statement of Facts and Separate Statement of Facts (Doc. 55 ("CSOF")). Intel replied (Doc. 56). Intel requested oral argument; however, the Court finds it unnecessary and will resolve the matter without it. *See* LRCiv 7.2(f). With briefing complete, and after reviewing the briefing and the relevant case law, the Court will **grant** Intel's Motion in full.

## I.    BACKGROUND[1]

---

[1] Plaintiff purports to dispute most of Defendant's alleged facts. (*See generally* CSOF.) Many of the bases for doing so, however, are either not supported by record evidence or include citations to irrelevant portions of the record. (*See, e.g.,* CSOF ¶ 5 (relying on Plaintiff's Declaration, which states that Plaintiff complained to her managers in one instance about racial discrimination in an email attached as Exhibit 8, but. that email does not mention discrimination); *id.* (relying on the Declaration to claim that Plaintiff's manager stated he would investigate and coach the supervisor discriminating against her. The cited paragraph of the Declaration does not reference the manager's alleged statement).) Essentially, Plaintiff's CSOF creates a quagmire in which nearly every fact offered by Defendant is bogged down. The Court, therefore, takes care to investigate

This is an employment case involving Plaintiff, a black catholic female Haitian-American of African descent, (CSOF ¶ 1), and her former employer, Intel, (SOF ¶ 1). Plaintiff was terminated on August 4, 2021. (*Id.* ¶ 18.) On December 21, 2021, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 12 ¶ 6.) Upon receiving the EEOC right to sue letter, Plaintiff filed this lawsuit. (*Id.*)

Initially bringing this case *pro se*, Plaintiff retained counsel and filed an Amended Complaint, which alleges that Intel and its employees discriminated against her based on her religion, sex, national origin, race, color, and disability. (*See* Doc. 12 ¶¶ 32–60; Doc. 54 at 1.) Each of Plaintiff's claims lie either in Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 1981, or the Americans with Disabilities Act ("ADA"). (Doc. 12 ¶¶ 32–60.)

**A. The Diffusion Group**

On May 6, 2019, Defendant hired Plaintiff to work as a Process Engineer in the Diffusion Group. (SOF ¶ 1.) Intel placed her under the supervision of Robert Colmyer. (*Id.*) As a Process Engineer, Plaintiff's responsibilities included performing technical tests in the wafer fabrication area supporting Intel's semiconductor manufacturing process. (*Id.* ¶ 2.) All newly hired Process Engineers must complete a series of trainings administered by factory technicians before becoming full-fledged engineers. (*Id.* ¶ 3.) The purpose of such training is to help new hires understand the tools and manufacturing process specific to their role on the fabrication floor. (*Id.*) Intel uses a graduated system of training, meaning that as Process Engineers progress through training, they advance to different training levels. (*Id.*)

Plaintiff trained with several technicians on the first level, Level 1 Operations ("L1 Ops") training. (*Id.* ¶ 4.) Plaintiff has provided a July 18, 2019 certification for completing L1 Ops for the following skills:

- Complete safety walks of area and tool with your trainer.
- Complete safety walk of area and be able to locate safety showers, eyewashers, and nearest exists, and be able to describe factory horns and [s]trobes.

Plaintiff's purported disputed facts to set out the necessary background.

- Complete safety walk of tool and be able to describe hazards and [l]ocations of EMO buttons.

- Apply for access for privileges in EAM/AGS.

(Doc. 55-1 at 20.)

Around October 2019, Mr. Colmyer decided that, with input from others, Plaintiff was not retaining the information she learned during L1 Ops and should return to that training step. (SOF ¶ 4; Doc. 46-1 at 2–36 ("Colmyer Depo."); Colmyer Depo. at 94–95, 122.) In April 2020, Mr. Colmyer, alongside other engineers, technicians, and his manager, Peter Zeng, drafted a formal coaching plan for Plaintiff based on his, and others, perception that her performance was below expectations. (Colmyer Depo. at 129–130; *see also* Doc. 55-1 at 37–41 (email chain between several Intel employees and Plaintiff wherein she complains of Mr. Colmyer, "Ariel," and "the Zestone team," expressing that she needed additional training to reach competency with the toolsets).) Around May 22, 2020, Mr. Colmyer delivered the formal coaching plan to Plaintiff. (SOF ¶ 5; *see also* Doc. 46-1 at 37.) Mr. Colmyer reported to Plaintiff that, although she passed L1 Ops previously, she was making several mistakes and that other trainers expressed concerns about her yelling at them, her lack of attendance and focus, and general disrespect towards other employees. (Doc. 46-1 at 37–38.)

Plaintiff believes that Mr. Colmyer delivered the formal coaching plan because of her race and national origin, and because of complaints she made to Human Resources ("HR") Manager Shawn Spendlove and Factory Manager Jim Evers. (CSOF ¶ 5.)[2] Her complaints to HR and the Factory Manager did not mention discrimination on any protected basis but did mention that Plaintiff felt the work environment was "hostile" because her managers were upset that she could not complete the training. (*See* Doc. 55-1 at 37–41.)

Around June 25, 2020, Plaintiff asked Intel's HR to remove the documented

---

[2] Plaintiff almost exclusively relies on her own deposition testimony and her own affidavit to dispute Intel's proffered facts. (*See generally* CSOF.) In other places, Plaintiff relies only on Federal Rule of Evidence 602.

coaching from her record and allow her to change groups. (Doc. 55-2 at 1–93 ("Lande Apr. Depo."); Lande Apr. Depo. at 70–72.) Intel's HR legal investigator, Trisha Sparacino, began an Open Door Investigation ("ODI") into Plaintiff's claims. (*See* Doc. 46-1 at 116–119 ("Sparacino Decl.") ¶ 9.) Ms. Sparacino interviewed fourteen individuals regarding the allegations and separately met with Plaintiff on three occasions. (Sparacino Decl. ¶ 11.) Plaintiff told Ms. Sparacino that Mr. Colmyer discriminated against her based on her race, gender, and national origin, and further retaliated against her for raising concerns about her training plan to HR in December 2019. (*Id.* ¶ 12.) Ms. Sparacino did not find evidence supporting Plaintiff's claims. (*Id.* ¶¶ 13–19.) During one of Ms. Sparacino's interviews, Area Manager Bobby Pitts indicated that he had spoken with Plaintiff but that she did not make any comments about discrimination, nor did she complain about discrimination. (Doc. 55-1 at 50–51.) Mr. Pitts recalled Plaintiff telling him that Mr. Colmyer would get loud and frustrated, but Mr. Pitts never observed this behavior. (*Id.*) Additionally, Mr. Pitts did not recall Plaintiff stating that Mr. Colmyer castigated her for not knowing the definition of certain common use English words. (*Id.*)

Despite finding no evidence to support Plaintiff's claims, Ms. Sparacino did find that Mr. Colmyer could have provided Plaintiff clearer direction and recommended removing the documented coaching. (Sparacino Decl. ¶ 18.) The ODI also resulted in Plaintiff receiving a Permanent Written Warning ("PWW"), dated September 18, for in "more than one instance . . . touch[ing] [her]self in an inappropriate manner in the workplace in the presence of other employees," for communicating in an "overly personal, unprofessional, and inappropriate" manner, and for being witnessed sleeping on the job "on more than one occasion. (*Id.* ¶ 18; Doc. 46-1 at 106.)[3] Ultimately, Ms. Sparacino recommended moving Plaintiff to a new role away from Mr. Colmyer to provide her "a fresh start in a new group with a more experienced manager." (*Id.* ¶ 19.) The ODI was

---

[3] Plaintiff requested a meeting with an ADA Case Manager on September 30, 2020, regarding an accommodation for dry eyes. On October 16, 2020, ADA Case Manager George Ohrn spoke with Plaintiff, during which she said that people accused her of sleeping, but she asserted that she closed her eyes or used a warm compress for fifteen minutes to merely remedy her dry eyes. (*See* Doc. 46-1 at 285.)

closed on August 24, 2020.  (*Id.* ¶ 9.)

## B. The Implant Group and Plaintiff's Termination

Following the ODI, Intel moved Plaintiff to the Implant Group.  (SOF ¶ 8.) Plaintiff's second-level manager, Mr. Pitts, assigned her to James Bladt's group with instructions that Mr. Bladt manage her training.  (*Id.*; *see also* Doc. 55-2 at 95–131 ("Bladt Depo."); Bladt Depo. at 40–42.)  Like in the Diffusion Group, Plaintiff was to complete L1 Ops.  (SOF ¶ 9.)  This version of L1 Ops obliged Plaintiff to train and achieve competency with the Varian High Current Implanter ("VIM") tool before engaging with the Process Engineering team and owning the tool.  (*Id.*; Bladt Depo. at 48.)

Plaintiff worked on shift 7 team alongside Manufacturing Operations Manager, Ryan Atkin, and experienced trainer-technicians Karl Ward, Chrisopher Warren, and Devin Scott.  (SOF ¶ 10–11.)  At some point, Plaintiff expressed concerns to Mr. Bladt that the trainers were not "signing her off," that is affirming her training competencies, on a training package called the "Infinity Package."  (*Id.* ¶ 12.)  The Infinity Package is a training system that includes materials that both technicians and engineers must complete as part of their competency training.  (Bladt Depo. at 64–68.)  Engineers are expected to complete the Infinity Package, including an engineer-specific set of trainings plus L1 Ops, before moving forward in the certification processes to become a tool owner.  (*Id.*)

During Plaintiff's training, Mr. Scott and others told Mr. Bladt that Plaintiff was having "a hard time performing and remembering what was just taught to her."  (Bladt Depo. at 55; *see also* Doc. 55-2 at 214–244 ("Scott Depo."); Scott Depo. at 63–65.) Implant Group certifier, Noah Block, also emailed Plaintiff, stating: "This is the follow-up email post your VIM L1 Ops Cert.  As we discussed yesterday at the end of four-plus hours. I cannot cert on . . . Level 1 VIM Ops at this time."  (Scott Depo. at 63.)  On three occasions, certifiers Cormac Cullen and Mr. Block declined to certify Plaintiff as a VIM tool owner. (Bladt Depo. at 94, 99–100 (testifying that Plaintiff failed to meet basic knowledge requirements during tool certification testing); *see also* Doc. 46-1 at 254–273 ("Cullen Depo."); Cullen Depo. at 30–21 (testifying the same).)

On May 26, 2021, Mr. Bladt and HR Partner, Heidi Zorn, issued Plaintiff a Corrective Action Plan ("CAP") to address the purported performance issues. (SOF ¶ 15; Doc. 46-1 at 188.) The CAP stated that, since starting in the Implant Group in September 2020, Plaintiff had completed only fifteen percent of her training in the previous nine months. (Doc. 46-1 at 188.) The CAP gave Plaintiff until July 14, 2021 to reach certain performance expectations, which included that she: (1) be present and engaged with the shift 7 and Project Engineers teams one she transitioned to "shift X"; (2) complete the L1 VIM Ops; (3) complete L1 certification; and (4) post L1 certification, engage with the Project Engineers team and become a tool owner. (*Id.*) Mr. Bladt extended the deadlines as follows: Complete L1 VIM Ops before July 24; and complete and pass L1 certification for the VIM tool by July 30. (Doc. 55-1 at 57.)

The earliest possible point that Plaintiff competed L1 VIM Ops was August 2, 2021. (*See* Doc. 55-1 at 72.) Plaintiff did not complete her certification and become a tool owner before the July 30 deadline. On August 4, 2021, Mr. Bladt and Mr. Pitts had a meeting with Plaintiff to inform her that she failed to meet the expectations set forth in the CAP and terminated her employment. (Bladt Depo. at 129–30; Doc. 55-2 at 151–213 ("Pitts Depo."); Pitts Depo. at 145–47, 149.)

**D. Plaintiff's Bases of Discrimination**

On December 21, 2021, Plaintiff filed a Charge of Discrimination (the "Charge") against Intel with the EEOC, claiming she had been subjected to discrimination from May 22, 2020 to August 4, 2021. (SOF ¶ 19.) This action followed. (*See id.*)

1. Race, Color, Gender, and National Origin Discrimination.

Plaintiff asserts that, in July 2019, Mr. Colmyer told her that needed redo her L1 Ops training "based on your race, woman of color." (*See id.* ¶¶ 22 (quoting Lande Apr. Depo. at 26, 34–36).) Lande further alleges that on January 29, 2021, Mr. Warren told her: "I don't have confidence with you based on you're a woman and this job is very hard. Especially because of your race, national origin, you cannot do this job, and because you're a woman." (*Id.* ¶ 23 (quoting Lande Apr. Depo. at 77–78).) And around July 2021, Mr.

Scott commented that "[o]nly white Americans and Canadians should be recognized in this country." (*Id.* ¶ 24 (quoting Lande April Depo. at 130–147).)

### 2. Sexual Harassment

Plaintiff asserts that, on July 23, 2021, Mr. Atkin harassed her when he responded to a request that the two meet to discuss raining tasks on the Infinity package. (*Id.* ¶ 25.) Mr. Atkin sent the message in an email thread containing Plaintiff, Mr. Bladt, and one other person. (*See* Doc. 55-1 at 67.) The message from Mr. Atkin read:

> Let's hook up on Saturday and go over the infinity list and see what we can do. As far as a VIM tool for qual, I currently have not had any VIM tools in qual today. I have had a PIA, XIM, and TIM, but no VIM. If I have a VIM qual, you are the first on my list to give it too. Thank you. (*Id.*)

(*Id.*) Plaintiff alleges Mr. Atkin's reference to a "hook up" was sexual in nature. (*Id.*) Plaintiff also claims that, prior to July 23, 2021, Mr. Atkin touched her inappropriately under the guise of helping her adjust her protective equipment. (*Id.* ¶ 26.) Plaintiff had not complained about the interactions involving the protective equipment, but did complain to Mr. Pitts about Mr. Atkin giving "fist bumps" to her. (*Id.* ¶ 26–27; CSOF ¶¶ 26–27 (disputed insofar as Plaintiff complained to Mr. Pitts about Mr. Atkin's fist bumps).) Plaintiff explained to Mr. Pitts that she did not want people touching her for fear that touching of their hands could transfer "bad energy" and "spirits" to her. (SOF ¶ 27 (quoting Lande April Depo. at 159 ("'[B]ad energy and spirit can come into me,' spirit of fornication, all those evil spirit.")).) When Plaintiff's request became known, Mr. Atkin stopped giving her fist bumps. (*Id.* ¶ 28.)

### 3. Religious Discrimination

Plaintiff testified that because she prayed aloud in her cubicle, Mr. Cullen complained to her supervisor, Mr. Bladt, that she was "doing voodoo and witchcraft." (Doc. 46-1 at 277–281 (Lande Aug. Depo.); Lande Aug. Depo. at 294.) According to Mr. Cullen, he could hear Plaintiff praying at her desk "for those that are hindering her progress to be removed." (Cullen Depo. at 54–55.) Plaintiff testified that, although she could not hear the conversation, she saw Mr. Cullen and Mr. Bladt talking and believed to be about her religious practices. (Lande Aug. Depo. at 294–95.) Sometime after Plaintiff observed

that conversation, Mr. Bladt told Plaintiff that her praying was making some of the team uncomfortable and that she could use Intel's prayer room, which was a short walk away. (SOF ¶ 33.)  Plaintiff did not use the prayer room because it did not conform to her religious customs and because "she was always in relationship with Jesus and the Holy Spirit." (CSOF ¶ 33.)

### 4.  Disability Discrimination

On October 6, 2020, Plaintiff requested an accommodation for her dry eyes.  (SOF ¶ 36.)  Intel provided her with an accommodation, granting her up to five fifteen-minute breaks to rest and close her eyes.  (*Id.*)  The accommodation was subsequently extended three times.  (*Id.*)  Plaintiff stated that she was too busy to take her breaks, and Intel's ADA coordinator, George Ohrn, encouraged her to take the breaks and to work with her managers to schedule the breaks.  (*Id.*)  Plaintiff concedes that she was granted a reasonable accommodation; however, managers and co-workers ignored it and made fun of her need for it.  (CSOF ¶ 36.)

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  The court need only consider the cited materials, but it may also consider any other materials in the record.  *Id.* 56(c)(3).  Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the non-movant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the non-movant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The non-movant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the non-movant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the non-moving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

## III.    DISCUSSION

### A. Title VII Discrimination

Employment discrimination claims require a plaintiff prove that the employer acted with discriminatory animus. *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998). On summary judgment, courts generally apply the three-part burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonald Douglas* framework requires, as relevant here, Plaintiff to prove a prima facie case by establishing that (1) she is a member of a protected class; (2) she was performing

competently in the position she held; (3) she suffered some adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008).[4] "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

If Plaintiff makes out a prima facie case, the burden shifts to the Intel to provide a legitimate, non-discriminatory reason for the alleged disparate treatment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). If Intel can do so, the burden then shifts back to Plaintiff to establish that the Intel's reasoning is pretext for discrimination. *Id.* Plaintiff can prove pretext in two ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000).

Intel argues that Plaintiff fails at the second and fourth step because she cannot show that she was performing competently nor that her employment was terminated under circumstances giving rise to an inference of discriminatory intent. (Doc. 45 at 6.) Plaintiff contends, without specifically eschewing *McDonnell Douglas*, that she need not make a prima facie case because she has presented direct evidence of discrimination, and therefore the case must proceed to the factfinder. (Doc. 54 at 2–5.) Plaintiff does respond, however, that she has proven a prima facie case of discrimination, and that Intel cannot satisfy its burden to show a non-discriminatory reason for her termination. (Doc. 54 at 7.)

Before reaching the *McDonnell Douglas* analysis, the Court will discuss why Plaintiff has not offered direct evidence of discrimination.

---

[4] The parties in this case quote the framework applied to Title VII retaliation claims when discussing Title VII discrimination. (Doc. 45 at 6 (citing *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103, 1105 (9th Cir. 2008)); Doc. 54 at 6.)

1        1.  <u>Direct Evidence</u>

2            The *McDonnell Douglas* framework is not the exclusive means of proving a Title

3    VII claim ought to survive summary judgment and proceed to the jury.  *See Costa v. Desert*

4    *Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002).  When a plaintiff presents direct evidence

5    of discriminatory motive, "a triable issue as to the actual motivation of the employer is

6    created even if the evidence is not substantial."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d

7    1217, 1221 (9th Cir. 1998); *see also Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090,

8    1095 (explaining that the highly probative nature of direct evidence requires plaintiff offer

9    "very little" of it to raise a genuine issue of material fact); *Mays v. United Ass'n Local 290*

10   *Apprenticeship and Journeymen Training Tr. Fund*, 407 F. Supp. 3d 1121, 1144 (D. Or.

11   2019).  Direct evidence is "evidence which, if believed, proves the fact [of discriminatory

12   animus] without inference or presumption."  *Godwin*, 150 F.3d at 1221.  Typically, direct

13   evidence consists of "clearly sexist, racist, or similarly discriminatory statements" by the

14   employer.  *Coghlan*, 413 F.3d at 1094–95; *see also Delmore v. Wash. State Dep't of Corr.*,

15   773 F. Supp. 3d 1125, 1151 (W.D. Wash. 2025) ("Direct evidence has been defined as

16   'conduct or statements by persons involved in the decision-making process that may be

17   viewed as directly reflecting the alleged discriminatory attitude.'" (quoting *Opara v.*

18   *Yellen*, 57 F.4th 709, 722 (9th Cir. 2023))).  This Court has explained that direct evidence

19   requires an admission by the decision-maker that his or her actions were based on the

20   prohibited animus.  *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075, 1080 (D. Ariz.

21   2017); *Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1162 (D. Ariz. 2016).  It stands to reason,

22   then, that uncorroborated, self-serving testimony from the plaintiff is not enough to show

23   direct evidence or put material facts into dispute.  *See Siales v. Haw. Elec. Co., Inc.*, No.

24   13-00413 LEK-KSC, 2013 WL 6210639, at *5–6 (D. Haw. Nov. 27, 2013); *Kennedy v.*

25   *Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).  Absent such remarks, a plaintiff must

26   show a nexus between a decision-maker's actions and a superior's discriminatory remarks.

27   *Vasquez*, 349 F.3d at 640.

28            Here, Plaintiff argues that the "factual record is replete with discriminatory

statements made by [Intel's] decision makers and [her] co-workers" in both the Diffusion and Implant Groups. (Doc. 54 at 3.) Plaintiff cites only to uncorroborated statements in her own deposition and declaration. (*See generally* Doc. 55-1; Doc. 55-2.) For example, Plaintiff avers that she spoke with Mr. Pitts in July 2019 and Mr. Evers in April 2020 regarding Mr. Colmyer's discriminatory remarks. (*See* Lande Decl. ¶¶ 16, 42.) Mr. Pitts statement at the time of Intel's ODI, which is consistent with his deposition testimony in this case, was that Plaintiff had not complained to him about discrimination in July 2019. (*See* Doc. 55-1 at 50–51; Pitts Depo. at 138–140.) Additionally, contrary to Plaintiff's averments that she reported Mr. Colmyer for "creat[ing] and foster[ing] a racially hostile work environment that was exclusionary," (Doc. 55-1 ¶¶ 31–32), the cited April 2020 email thread with Mr. Evers contains no mention of discrimination, retaliation, or harassment based on Plaintiff's protected statuses. (*See* Doc. 55-1 at 37–41.)

The record also shows that Plaintiff could not identify the specific discriminatory remarks Mr. Colmyer said to her:

**Q:** Okay. You said based on your [r]ace. Is that what you believe?

**A:** That's not what I believe. That's what [Mr. Colmyer] said.

. . . .

**Q:** And what are the exact words he used?

**A:** I can't remember his exact word. For example, he told me you—you are am—ambiguous, you cannot understand what is ambiguous.

**Q:** So he told you, you don't understand what ambiguous means?

**A:** I don't understand the meaning of the term.

. . . .

**Q:** Did he make any—did he say anything about you being a woman?

**A:** All the time. All the time.

**Q:** Okay. Right now I'm talking about the July 2019 meeting you had with [Mr. Colmyer]. Did he say in that meeting anything about you being a black woman?

**A:** Yes. He said very black woman.

**Q:** What did he say?

**A:** I cannot pass the certification. He never—in his head I never even—I

never passed the certification. In his head I never passed the certification. Maybe up to now I never passed the certification. I never passed—for him I never passed the certification. No matter how many people who have passed me, he doesn't agree that I passed the certification.

(Lande Apr. Depo. at 36.)   The same is true for other Diffusion Group employees who allegedly subjected Plaintiff to discrimination:

> **Q:** So Sarah Romero was your first trainer when you started?
>
> **A:** Sarah Romero—Ariel was my trainer.
>
> **Q:** Okay.
>
> **A:** But she didn't accept me, hypocritically. She didn't accept me because of my race . . . . But Ariel rejected me because of my race and sent me over.
>
>                    . . . .
>
> **Q:** Okay I want to talk about Ariel, though, because you told me she has a good reputation with the company, that she has a lot of experience in this job; but also, that you believe she rejected you because of your race.
>
> **A:** Yes.
>
> **Q:** And I want to know what facts you have to support your allegation that Ariel rejected you because of your race.
>
> **A:** I just came. She send me to the new—to the other group. She didn't have time. She didn't want to work with me, she told me.

(*Id.* at 60.)[5]

Plaintiff has similarly failed to show evidence of direct discrimination during her time in the Implant Group.  Plaintiff avers that her first trainer, Mr. Warren, "consistently told me that because of my race and gender, I was unable to learn what he was trying to show me . . . . Consequently, I was forced to perform duties, that non-Black trainees weren't required to perform."  (Lande Decl. ¶ 49.)  Plaintiff has not cited to any record evidence to support this claim.  Reviewing the record does not corroborate this claim either.  At his deposition, Mr. Warren described a difficult working relationship where he often found himself repeating the basic parts of L1 Ops.  (*See* Doc. 46-1 at 238–245 ("Warren

---

[5]   The Court notes that Plaintiff has also failed to explain how the alleged (but unsubstantiated) discriminatory acts from persons in the Diffusion Group either influenced or caused her termination by a decision maker in the Implant Group over a year later.  *See Everts*, 247 F. Supp. 3d at 1080 (stating that, without an admission by the decision-maker that his actions were based on discriminatory animus, a plaintiff much show a nexus between the actions and a superior's discriminatory remarks).

Depo."); Warren Depo. at 50–59.)  Mr. Warren testified that he became frustrated with Plaintiff's use of her phone and her lack of overall progress.  (*See id.* at 58–60.)  After he reached his "stress limits," Mr. Warren requested that she be reassigned.  (*Id.* at 60.)  Plaintiff, on the other hand, testified that she did not work much with Mr. Warren because he "transferred [Plaintiff]" on the first day they met, and she only spoke with Mr. Warren to get signed off on tasks.  (Lande Apr. Depo. at 80.)  Plaintiff contends that Mr. Warren approved of her answers to two questions before telling her, verbatim: "I don't have confidence with you based on you're a woman and this job is very hard.  Especially because of your race, national origin, you cannot do this job, and because you're a woman."  (*Id.* at 77–78.)  Plaintiff stated in another instance that Mr. Warren "shooed [her] out of the fab, telling me based on my protected class, he's not going to sign off on anything."  (*Id.* at 226.)  Beyond Plaintiff's own uncorroborated statements, nothing on the record evidence Mr. Warren's remarks.  And further, nothing shows a nexus between Mr. Warren's remarks and Mr. Bladt and HR's decision to terminate Plaintiff.  *See Vasquez*, 349 F.3d at 640.

Plaintiff also contends that Mr. Scott often called Plaintiff "shit," made inappropriate hand gestures at her, and refused to work with her, thereby jeopardizing her ability to become a tool owner and remain employed. (*See* CSOF ¶ 13; Doc. 54 at 5; Lande Decl. ¶ 54.)  Plaintiff, however, does not connect these alleged comments and actions to her protected statuses.  So, if true, Mr. Scott's actions are certainly rude, but they do not constitute direct evidence of discrimination.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth a general civility code for the American workplace.").  Similarly, there is no competent evidence that Mr. Scott repeatedly made statements aligning himself with white supremacists, uttered racial slurs at Plaintiff, or purposefully sabotaged Plaintiff's ability to complete her work because of her protected statuses.  (*See* Bladt Depo. at 105; Scott Depo. at 101–102, 105, 108; Atkin Depo. at 57–59.)

Plaintiff also contends that Mr. Bladt, upon meeting her, discriminated against her based on her sex and race:

**Q:** You're telling me . . . not only do you believe that everyone was out to get you because you're a black woman from Haiti?

    . . . .

**A:** Correct.

**Q:** But you're also telling me that James Bladt told you, he expressly told you I don't think you can learn because you're black.

**A:** Yes.

**Q:** And I don't think you can learn because you're a woman?

**A:** Yes.

**Q:** Okay. You understand that James Bladt is going to deny those statements, correct?

**A:** I can explain to you. I have my proof that I finish my certification in two months when I came to Intel. I have proof, legal proof, like I have my certification in two months. Everybody has their certification in. Nobody has that stop. Me, because of my race, I have that stops.

(Lande Apr. Depo. at 109–110.)    No proof beyond this Plaintiff's uncorroborated statements has been entered in the record.

While Plaintiff's claims regarding racism and xenophobia, if true, would support her allegations of direct discrimination, there is no evidentiary support for such claims. Reviewing the entire record reveals that the only direct "evidence" of discriminatory remarks is Plaintiff's own testimony that those remarks were uttered. She has not produced anything obtained during the discovery phase of this case that shows a decision-maker or supervisor discriminated against her in either everyday work or in deciding to terminate her employment. *See Everts*, 247 F. Supp. 3d at 1080; *Siales*, 2013 WL 6210639, at *6 (finding no direct evidence of discrimination where the "[p]laintiff ha[d] merely offered the uncorroborated allegations and self-serving statements in his own declaration").[6]

---

[6] As Intel has pointed out, the Ninth Circuit has forewarned that self-serving depositions and affidavits cannot alone cast material facts into doubt. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir.1993); *United States v. One Parcel of Real Property*, 904 F.2d 487, 492 n.3 (9th Cir.1990); *Kennedy*, 90 F.3d at 1481. However, in the direct evidence context, a lone Ninth Circuit panel remanded for trial a hostile work environment sexual harassment claim because, among other things, the district court "inappropriately weighed [the plaintiff's] credibility in dismissing her allegations as 'vague and conclusory,' 'unsupported', and 'self-serving.'" *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005).

In that case, like here, the plaintiff offered her own deposition and affidavit when submitting a direct evidence argument to the trial court. *See id.* at 1036. The Ninth Circuit faulted the district court for improperly characterizing the plaintiff's deposition and declaration testimony as self-serving when a non-party affiant's testimony admitted to

Plaintiff need not produce much to show direct evidence, *Godwin.*, 150 F.3d at 1221, but Plaintiff must show something beyond myriad unadorned statements that leagues of her coworkers plotted against her because of her protected statuses. *See Bovarie v. Schwarzenegger*, No. 08CV1661 LAB NLS, 2011 WL 7468597, at *17 (S.D. Cal. Sept. 21, 2011) ("Plaintiff's own opinion and skewed characterization of events does not suffice to create a genuine issue of material fact.").

It is prudent the Court notes here that, in addition to a complete lack of evidentiary support, Plaintiff's allegations—while not factually impossible—are highly improbable, particularly when no other deponent or witness could corroborate a single allegation supportive of Plaintiff's claims. Plaintiff's attestations of wide-spread, robust, constant, and continuous discrimination are particularly questionable as, if any are to be believed, the witnesses would be inherently numerous. Nevertheless, Plaintiff could not identify any Intel employee that witnessed the alleged discrimination. (*See, e.g.*, Lande Apr. Depo. at 64, 103.) Nor has any other evidence been produced that would substantiate rampant racism, omnipresent misogyny, or any other widespread religious or disability discrimination. Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (noting that improbable allegations may properly be disposed of on summary judgment); *In re Chavin*, 150 F.3d 726, 728–29 (7th Cir. 1998) (holding that the *Matsushita* rule

---

much of the plaintiff's allegations. *See id.* The Ninth Circuit also chided the district court for weighing the credibility of submissions, calling it "a determination that is exclusively within the province of the factfinder at trial." *Id.* This Court is presented with no such additional evidence, as nothing on the record shows that the allegations Plaintiff makes are supported by even a scintilla of evidence. The key distinction here is that Plaintiff's deposition and declaration echo her allegations and are uncorroborated by any record evidence such that the Court may find that she has submitted direct evidence of discriminatory animus. *See Everts*, 247 F. Supp. 3d at 1080 ("[D]irect evidence requires an admission by the decision-maker that his or her actions were based on the prohibited animus."). Therefore, in light of the several admonitions of allowing a record bereft of any probative evidence to show direct evidence or create a genuine dispute, the Court concludes that characterizing Plaintiff's own deposition and declaration as uncorroborated and self-serving does not run afoul of the duty of the jury to weigh credibility. *See Kennedy*, 90 F.3d at 1481; *Siales*, 2013 WL 6210639, at *6.

requiring a heightened burden for implausible claims is not limited to claims of "physical impossibility").

The Court remains mindful that it may not make "[c]redibility determinations or weigh the evidence" at this stage in the proceedings, and it does not do so here, *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000), but "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the trial court has at least some discretion to determine whether the respondent's claim is "implausible," *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989). Regardless of the burden, Plaintiff has failed to meet it. *Johnson*, 883 F.2d at 128 ("The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury."); *Zolnierz v. Arpaio*, No. CV-11-146-PHX-GMS, 2012 WL 1432537, at *2 (D. Ariz. Apr. 25, 2012) (summary judgment may be granted when the non-moving party can produce only "uncorroborated and self-serving" statements that lack an evidentiary basis).

Here, while the statements and the pervasiveness of Plaintiff's alleged remarks would undoubtedly amount to discrimination, Plaintiff failed to put forth any direct evidence, even after discovery, to show that the conduct occurred. Given that Plaintiff has failed to adduce direct evidence of discrimination, the Court will now apply the *McDonnell Douglas* framework.

## 2. The *McDonnell Douglas* Framework

To recap, Intel argues that Plaintiff fails at the second and fourth prima facie levels, as she cannot show that she was performing competently nor that her employment was terminated under circumstances giving rise to an inference of discriminatory intent. (Doc. 45 at 6.) Plaintiff disagrees. (*See* Doc. 54.)

### a. *Plaintiff's Performance at Intel*

Intel contends that Plaintiff's performance as a Process Engineer fell well below

expectations.  (Doc. 45 at 6.)  Intel further asserts that Plaintiff cannot show competence in her position because, even after Plaintiff was transferred to the Implant Group, her training was taking more than twice as long as expected, and she failed to improve despite a CAP.  (*Id.* at 6–7.)

Plaintiff argues that genuine dispute of fact exists as to the quality of her work performance because Mr. Colmyer did not contemporaneously document her poor performance and made discriminatory comments about her.  (Doc. 54 at 6.)  Moreover, Plaintiff argues that any performance issues brought up by Mr. Bladt are suspect because he made discriminatory comments about her.  (*Id.*)  And according to Plaintiff, the remarks that co-workers and trainers in the Diffusion and Implant Groups made to Plaintiff impeded her progress and was never addressed, therefore, any performance issues are overcome by the discrimination she faced.  (*Id.*)  Finally, Plaintiff argues that her performance was not an issue because she completed L1 Ops in the Diffusion group and completed the Infinity Package in the Implant Group.  (*Id.*)

Before diving into the performance analysis, the Court must note two issues with Plaintiff's argument.  First, whether Plaintiff completed L1 Ops in the Diffusion Group is of no moment in determining whether she was performing competently before her termination.  It is undisputed that Plaintiff was moved from the Diffusion Group to the Implant Group after the ODI investigation and was subject to a new set of training materials to show competency.  Therefore, Plaintiff's provided screenshot from July 2019 signifying completion of the Diffusion Group L1 Ops training is irrelevant for this piece of the prima facie analysis.  Second, Plaintiff's argument pertaining to her performance is mixed in alongside arguments in support of pretext, retaliation, and unadorned statements of exemplary performance without supporting evidence.  (*See* Doc. 54 at 6.)  The performance inquiry is directed precisely at whether Plaintiff can make the minimal showing that she was competently executing her job responsibilities.  *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002).  The Court will therefore only entertain Plaintiff's arguments pertaining to her performance at this time.

The relevant evidence Plaintiff puts before the Court consists of her own subjective personal judgments about her performance, (*see generally* Lande Apr. Depo.; Lande Decl.), an email from Mr. Gibbs sent to Mr. Scott, Mr. Atkin, Mr. Bladt, Robert Naujokatis, Plaintiff, and Mr. Pitts, which reads: "Done, package reflects 100%, (Doc. 55-1 at 72), and several other email communications signifying that Plaintiff was making some progress during the CAP period, (*id.* at 57–64).

Intel attacks Plaintiff's subjective self-evaluation, viewing it as legally insufficient to establish a prima facie case of discrimination. (Doc. 56 at 3 n.2 (citing *Otsyula v. Or. Dep't of State Lands*, No. CV 07-1390-ST, 2008 WL 5246092, at *6 (D. Or. Dec. 16, 2008)).) *Otsyula* quotes *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996), which states that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact." However, the Ninth Circuit later clarified that *Bradley*'s holding "did not pertain to the minimal showing needed to establish a prima facie case; rather, it spoke to the employee's lack of specific and substantial evidence showing that the employer's reasons for terminating him were false or discriminatory." *Aragon*, 292 F.3d at 660.

In any case, Plaintiff's evidence, specifically the CAP and her apparent improvements, do not show that she was competently performing in her role as a Process Engineer. Indeed, it is undisputed that, in the Implant Group, Plaintiff was required to complete the L1 Ops on the VIM tool and then be certified on the VIM tool before she was to become a tool owner and full-fledged Process Engineer. (*See* SOF ¶ 9; CSOF ¶ 9.) This requirement was reiterated in the CAP. (*See* Doc. 46-1 at 103.) By the CAP deadlines on July 24 and 30, 2021, Plaintiff had not achieved any of the predetermined expectations. (*See Id.*) Plaintiff, at best, completed 100% of some package on August 2, 2024. (Doc. 55-1 at 72.) Even assuming that this package was the Infinity Package, Plaintiff still failed to complete it on time and had not taken nor passed the required certification to become a "Process Engineering [VIM] tool owner." (Doc. 46-1 at 103–104.) Thus, Plaintiff has failed to show that she was performing competently in her position as a Process Engineer.

1    *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 (9th Cir. 2008) (relying on

2    the proposition that "[a] plaintiff who violates company policy and fails to improve his

3    performance despite a warning has not demonstrated satisfactory performance" to find that

4    the plaintiff failed to establish a prima facie case).  That being the case, no reasonable juror

5    could find that Plaintiff's performance was satisfactory to support a prima facie case under

6    the *McDonnell Douglas* framework.

7                                  *b.  Similarly Situated Employees*

8           Intel argues that Plaintiff has produced no evidence to show a link between her

9    protected statuses and her termination.  (Doc. 45 at 7.)  Specifically, Intel asserts that there

10   is zero evidence of discriminatory animus or differential treatment towards similarly

11   situated employees.  (*Id.*)  Nor is there evidence that Intel departed from its standard

12   termination policies or that Intel allowed other employees to remain at the business if they

13   could not pass the certification.  (*Id.*)

14          Plaintiff has not, at least discernibly, advanced an argument that similarly situated

15   employees were subject to more favorable treatment in support of her prima facie case.

16   (*See* Doc. 54 at 6–7.)  To rebut Intel's position, Plaintiff relies on the same arguments she

17   made in support of her performance at Intel to show a link between her protected statuses

18   and termination.  (*See id.*)

19          The burden of establishing a prima facie case under Title VII is not onerous.  *See*

20   *Ames v. Ohio Dept. of Youth Servs.*, 145 S. Ct. 1540, 1545 (2025).  But it is still a burden,

21   nonetheless.  Plaintiff has not produced any evidence that similarly situated engineers in

22   the Implant Group received fairer treatment or remained employed after having failed to

23   meet basic job requirements.  (*See generally* Lande Apr. Depo.; Lande Decl.)  Therefore,

24   the Court finds that Plaintiff has failed to establish that any other similarly situated

25   employee was subject to more favorable treatment and thus has failed to show any causal

26   nexus between her termination and protected statutes.  *Davis*, 520 F.3d at 1090.

27          At bottom, Plaintiff has failed to establish the second and fourth elements of her

28   prima facie case, making summary judgment appropriate.

*c. Legitimate Non-Discriminatory Reason and Pretext*

Even if Plaintiff met her prima facie burden, Intel easily articulates a non-discriminatory reason for her termination for which Plaintiff cannot establish pretext.

Intel fired Plaintiff for poor performance.  In May 2021, about a year after Plaintiff transferred to the Implant Group, Mr. Bladt, Mr. Pitts, and Ms. Zorn issued a CAP to Plaintiff, noting that she had yet to achieve more than fifteen percent completion on the required training materials.  (Doc. 46-1 at 102–103.)  The CAP noted that Plaintiff's VIM L1 Ops training, which began around October 8, 2020, was expected to take around twelve weeks.  (*Id.* at 103.)  At the time the CAP was issued, Plaintiff's training had reached the twenty-eight-week mark.  (*Id.*)  Also, by that time, several trainers and team members had provided her guidance, and two different trainers refused to certify her over three certification attempts.  (*Id.*)  Plaintiff remarked that the reason she could not complete her training was that her trainer did not feel comfortable signing off on her competences.  (*Id.*; *see also* Warren Depo. at 50–59 (stating that Plaintiff struggled to perform basic job duties.)  The CAP explained that Plaintiff also received coaching about several unexcused tardies and leaving shift early.  (Doc. 46-1 at 103.)  The CAP outlined Intel's expectations that Plaintiff reach several performance goals by July 14, 2021, which was later extended to July 30 after Plaintiff was scheduled to be out of work.  (Doc. 46-1 at 103; Doc. 55-1 at 57.)

As the Court already discussed, Plaintiff was required to complete the L1 Ops training on the VIM tool and then be certified on the tool before she was to become a tool owner and full-fledged Process Engineer.  (*See* SOF ¶ 9; CSOF ¶ 9.)  This requirement is reiterated in the CAP.  (*See* Doc. 46-1 at 103.)  By the CAP deadline, Plaintiff had not completed a single item listed on the CAP.  This, as Plaintiff assented to and understood, would result in her termination.  (*See id.* at 104.)

Plaintiff contends that her direct evidence of discriminatory animus would render Intel's non-discriminatory reason for terminating her unworthy of credence.  (Doc. 54 at 7.) The Court has already discussed and found that such evidence is lacking from the record.

*Godwin*, 150 F.3d at 1221–22 (explaining that a plaintiff must produce "specific, substantial evidence of pretext" (quoting *Bradley* 104 F.3d at 270)); *Siales*, 2013 WL 6210639, at *6 (finding uncorroborated allegations and self-serving statements in plaintiff's declaration insufficient to establish direct evidence). Instead, the record makes clear that, over an extended period, Plaintiff utterly failed to meet the basic expectations of her position as a Process Engineer in the Implant Group.

Therefore, even if Plaintiff established a prima facie case, the Court finds summary judgment on Plaintiff's Title VII discrimination claim appropriate because Intel has articulated a legitimate non-discriminatory reason for terminating Plaintiff, and Plaintiff has failed to show pretext.

### B. Title VII Retaliation

Like discrimination claims, courts use the *McDonnell Douglas* framework to address Title VII retaliation claims. To establish a prima facie case for retaliation, Plaintiff must show that: (1) she engaged in a protected activity; (2) she was then subjected to an adverse employment action; and (3) there exists a causal link between the protected activity and the adverse employment action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). Again, if Plaintiff establishes a prima facie case, Intel must then articulate a legitimate, non-retaliatory reason for its actions before the burden shifts back to Plaintiff to show pretext. *Maner v. Dignity Health*, 350 F. Supp. 899, 906 (D. Ariz. 2018).

Intel argues that Plaintiff's retaliation claim fails at the third prima facie level because Plaintiff cannot show causation by relying on a May 2020 complaint as the basis for her discharge fifteen months later. (Doc. 45 at 9.) In turn, Plaintiff argues that she complained about discrimination from December 2019 until her termination, and that Intel retaliated against her in six different ways: (1) On January 17, 2020 Mr. Colmyer screamed at her for something she did not do; (2) Mr. Colmyer issued her Formal Documented Coaching on April 13 for complaining of discrimination on April 9, 2020; (3) On June 25, 2020 Intel issued a PWW[7] for inappropriate behavior discovered only after she complained

---

[7] Disciplinary actions, such as PWW's in this case, are not adverse employment actions. *See Hellman v. Weisberg*, 360 Fed. Appx. 776, 778–79 (9th Cir. 2009).

of discrimination; (4) allowed trainers and coworkers to harass her on protected grounds; (5) allowed trainers and coworkers to refuse to train her; and (6) terminated her employment.  (Doc. 54 at 8.)

Many of Plaintiff's proffered retaliatory acts are red herrings (and dated incorrectly).  Plaintiff complained to HR regarding her training in April 2020 and only complained of discrimination in June 2020, after receiving documented coaching.  (*See* Lande Apr. Depo. at 70–72; Sparacino Decl. ¶ 9.)  However, no adverse employment action is tied to her complaints in the Diffusion Group.  Mr. Bladt, the primary decision maker for Plaintiff's termination from the Implant Group, was not aware of Plaintiff's complaints in the Diffusion Group; nor is there evidence that Plaintiff told him about discriminatory acts by other employees such that her termination could be connected to those complaints.  (*See generally* Doc. 46-1; Doc. 55-1; Doc. 55-2.)  Similarly, to the extent that Mr. Pitts and Ms. Zorn knew of Plaintiff's June 2020 complaints, her termination some fifteen months after the issues transpiring in the Diffusion Group fails to show causation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close . . . Action taken (as here) 20 months later suggests, by itself, no causality at all." (quotation altered)); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (finding essential to showing causation is "evidence that the employer was aware that the plaintiff had engaged in protected activity").  In short, there is no evidence that Intel's decision to terminate Plaintiff was influenced by any protected activity she engaged in.[8]

At bottom, there is no dispute of material fact related to Plaintiff's Title VII retaliation claim.  Summary judgment is therefore appropriate.

///

---

[8]  To be sure, even if Plaintiff could establish a prima facie case, there is no substantial evidence on record to overcome Intel's countervailing legitimate reason for terminating Plaintiff after a yearslong bout of poor performance.

1

**C.  Discrimination and Retaliation Under 42 U.S.C. § 1981**

Section 1981 claims are generally analyzed under the same framework as Title VII claims.  *See Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985).  "The same standards are used to prove both claims, and facts sufficient to give rise to one are sufficient to give rise to the other."  *Id.* (internal citation omitted).  Under this standard, then, Plaintiff has likewise failed to state claims for either discrimination or retaliation under § 1981.  *See id.*[9]

**D.  Title VII and § 1981 Hostile Work Environment Harassment**

To establish prima facie claims of harassment under Title VII and § 1981, Plaintiff must show that: (1) she was subjected to verbal or physical conduct of a racial or sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  *Vasquez*, 349 F.3d at 642; *Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003).  To be actionable, the hostile environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  District courts are directed to "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (citation altered).

The nature of Plaintiff's evidence—her own uncorroborated deposition and declaration—preclude her from making the requisite objective showing to send her hostile

---

[9]  Intel contends § 1981 claims now require a plaintiff to establish that race was the determinative reason for the purported adverse actions, not merely a motivating factor.  (Doc. 45 at 11.)  Intel's rationale for this is that, reading recent United States Supreme Court cases together necessitate such a standard.  *Compare Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327 (2020), *with Bostock v. Clayton County*, 590 U.S. 644 (2020); *see also Arevalo-Carrasco v. Middleby Corp.*, 851 Fed. App'x 628, 630–31 (7th Cir. 2021).  Though the Court proceeds under the *Lowe* standard, it notes that applying the "determinative reason" standard would also result in summary judgment for Intel due to the lack of evidence of any race discrimination on record.

work environment claim to the jury.  *Cf. Villiarimo*, 281 F.3d at 1061 ("uncorroborated and self-serving testimony," without more, will not create a genuine issue of material fact precluding summary judgment).  Even so, the Court will discuss Plaintiff's claims.

Regarding race-based harassment, Plaintiff offers details for three events.  In July 2019, Mr. Colmyer stated Plaintiff needed to redo the Diffusion Group L1 Ops "based on your race, woman of color."  (SOF ¶ 22; CSOF ¶ 22.)  Second, on January 29, 2021, Mr. Warren told her "I don't have confidence with you based on you're a woman and this job is very hard.  Especially because of your race, national origin, you cannot do this job, and because you're a woman."  (SOF ¶ 22; CSOF ¶ 22.)  Putting aside that the record does not evidence these statements were made, neither rises to the level of actionable harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (explaining that hostile work environment claims are "based on the cumulative effect of individual acts" over "a series of days or perhaps years" and that "a single act of harassment may not be actionable on its own").  And even if they could, the claims under Title VII are barred because plaintiff failed to file with the EEOC on time. 42 U.S.C. § 2000e-5(e) (establishing 180- and 300-day periods for filing EEOC charges); *Sommantino v. United States*, 255 F.3d 704, 707–08 (9th Cir. 2001) ("In order to bring a Title VII claim in district court, a plaintiff must first exhaust her administrative remedies.").  The acts occurred in July 2019 and January 2021, and Plaintiff filed her EEOC Charge on December 21, 2021, making the earliest possible instance actionable approximately February 24, 2021.  *See Morgan*, 536 U.S. at 115.

Plaintiff also alleges that Mr. Scott, on three occasions in July 2021, made the comments concerning how "[o]nly white Americans and Canadians should be recognized in this country."  (SOF ¶ 24; CSOF ¶ 24.)  Intel contends that Mr. Scott's comments do not constitute a continuing course of conduct that extends the statute of limitations.  (Doc. 45 at 13.  The Court agrees.  Hostile environment claims involve repeated, hostile conduct, and thus discrete acts occurring on any particular day are not actionable on their own.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Morgan*, 536 at 115.  Mr.

Scott's comments, although having the potential to engender offensive feelings, do not "so pollute the workplace that it altered the conditions of [Plaintiff's] employment." *Manatt*, 339 F.3d at 798.  Comparing the facts of this case to *Manatt* helps dispel any contention that Mr. Scott's comments are legally sufficient to create an actionable claim.  In *Manatt*, the court found the plaintiff's coworkers behavior amounted to "simple teasing" and "offhand comments" when they referred to the plaintiff as a "China man," accosted him for mispronouncing "Lima," and pulled their eyes back with their fingers to imitate or mock the appearance of Asians.  *See id.*  The Ninth Circuit explained that the "regrettable incidents occurring over a span of two-and-a-half years, coupled with other offhand remarks" did not alter the conditions of the plaintiff's employment.  *Id.* at 799.  Now, with respect to Mr. Scott's comments, they are, at worst, insensitive comments and "off-color" comments of a political nature.  *Jordan v. Clark*, 847 F.2d 1368, 1374–75 (9th Cir. 1988) (finding no hostile work environment where "off-color" jokes were told in the workplace).  And because his comments do not amount to harassment, they cannot act as a continuing course of conduct to extend the statute of limitations for any stale claims.

It is important here to recall that neither § 1981 nor Title VII establish a "general civility code" for the workplace, and thus any of the offered comments do not suffice to show a prima facie case of race-based hostile work environment.  *See Manatt*, 339 F.3d at 798.

Regarding Plaintiff's sexual harassment claim, she asserts that on July 23, 2021 Mr. Atkin propositioned her for sex in exchange for training.  Mr. Atkin's message read as follows:

> Let's hook up on Saturday and go over the infinity list and see what we can do. As far as a VIM tool for qual, I currently have not had any VIM tools in qual today. I have had a PIA, XIM, and TIM, but no VIM. If I have a VIM qual, you are the first on my list to give it too. Thank you.  (*Id.*)

(Doc. 55-1 at 67.)  Mr. Atkin's message was in an email sent to Plaintiff, Mr. Bladt, and one other person.  (*See* Doc. 55-1 at 67.)  The Court recognizes that the term "hook up" can be sexual in nature.  *See Hook up*, Cambridge Dictionary, available at https://dictionary.cambridge.org/dictionary/english/hook-up (last visited July, 25, 2025)

(meaning "to meet or begin to work with another person or other people" or "to begin a romantic or sexual relationship with someone").  The record evidence and context in this case assuredly supports Intel's position: no reasonable juror could conclude Mr. Atkin's email was intended to be or was quid pro quo sexual harassment.  (Doc. 45 at 14.)  First, it defies all reason to find that Mr. Atkin attempted to trade sexual relations with Plaintiff for training on an email chain with Mr. Bladt, an Intel manager, and one other employee.  Second, neither this message, nor other evidence on the record, support finding that Mr. Atkin intended his message to convey any other meaning that his intent to train Plaintiff on that Saturday.  *See Holly D. v. Calif. Institute of Tech.*, 339 F.3d 1158, 1172 (9th Cir. 2003) (stating a claim may exist when "a supervisor's words or conduct would communicate to a reasonable woman in the employee's position" that "participation in sexual acts" is a condition of employment); *see e.g.*, *id.* at 1175 (finding that the plaintiff did not present evidence to ward off summary judgment even where supervisor was a "demanding" supervisor that "was prone to making statements concerning sex").  The text exchange between Mr. Atkin, Plaintiff, Mr. Bladt, and the other unidentified employee is therefore not actionable as sexual harassment.  *Cf. id.*

On July 15, 2021, Plaintiff emailed her second-level manager, Mr. Pitts, and explained as follows:

> I clearly tell Ryan Atkin to never ask me to touch my hands. I do not tolerate him do that to me. He is a person I heard with my own ears gossiping on me many times around the desks with the others managers to make me look bad and so on. [I] do not want people gossiping to touch me; bad things or energy or spirit can be transferred.

(Doc. 55-1 at 55.)  Mr. Atkin testified that Plaintiff asked him to stop giving her fist bumps and he did so.  (*See* Atkin Depo at 83–84.)  Plaintiff alleges that the fist bumps, paired with inappropriate touching of the breasts, shows that Mr. Atkin was attempting to engage in a sexual encounter with him.  (Doc. 54 at 12.)  Plaintiff also argues that she complained to Mr. Pitts about Mr. Atkin's behavior, but no corrective action was taken.  (*Id.*)  The record only supports that Plaintiff complained to Mr. Pitts about the fist bumps, which Mr. Atkin refrained from doing once Plaintiff asked him to stop.  (Atkin Depo. at 83–84.)  There is

not a single piece of evidence on the record to support finding that Plaintiff's coworkers inappropriately touched her breasts. It is established that workers would adjust one another's protective equipment, but no deponent or declarant on this record, Plaintiff included, could show that any worker inappropriately touched Plaintiff's breasts or other body parts.

Plaintiff testified that her coworkers subjected her to religious harassment. (*See, e.g.*, Lande Aug. Depo. at 294.) The single occasion of alleged harassment on record involves a situation where Mr. Cullen complained to Mr. Bladt about Plaintiff praying out loud at her desk. (*See id.*) According to Plaintiff, Mr. Cullen commented that Plaintiff was practicing witchcraft and voodoo. (Lande Apr. Depo at 120–121.) No competent evidence suggests that Mr. Cullen either made these comments, nor that they were so pervasive as to "so pollute the workplace that it altered the conditions of [Plaintiff's] employment." *Manatt*, 339 F.3d at 798.

Plaintiff avers that her coworkers, including Mr. Scott and Mr. Atkin, subjected her to harassment based on her eye condition. (*See, e.g.*, Lande Decl. ¶ 59.) Nothing on the record corroborates this statement. (*See, e.g.*, Scott Depo. at 65 (unaware of Plaintiff's eye condition); Atkin Depo. at 37 (same).)

Even if Plaintiff could establish race-, sexual-, religion-, or disability-based harassment, Intel can establish the "reasonable care" defense recognized in *Faragher*, 524 U.S. at 778. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

The Supreme Court has explained that not every employer must show it promulgated an antiharassment policy and accompanying complaint procedure, but the presence or absence of such policy is addressed on a case-by-case basis. *Id.*; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Here, it is uncontested that Intel had an anti-harassment policy and an ODI procedure. (*See* SOF ¶ 29.) Although Plaintiff has

disputed whether the policy and procedure were efficient, as she asserts (incorrectly) that Intel failed to promptly investigate her discrimination complaints. (CSOF ¶ 29; Sparacino Decl. ¶¶ 9, 15.)  Moreover, it is uncontested that Plaintiff was familiar with Intel's anti-harassment guidelines. (*See* SOF ¶ 30; CSOF ¶ 30.)  And, as Intel has demonstrated, upon Plaintiff's first complaint of discrimination in June 2020, it immediately conducted an ODI and found no evidence to support her claims. (Sparacino Decl. ¶ 13.)  The facts show that plaintiff knew how to raise a complaint, knew that Intel would investigate, and could reasonably expect that HR would facilitate corrective action. The facts also show that Plaintiff did not attempt to use Intel's internal complaint system to ameliorate the discriminatory acts she alleges occurred in the Implant Group. Plaintiff failure is critical because her prior knowledge, use, and success in asking HR to conduct an ODI for her complaints in the Diffusion Group, but not in the Implant Group, show that she unreasonably failed to take advantage of any preventive or corrective opportunities that Intel provided. *Faragher*, 524 U.S. at 778.  Therefore, the Court concludes that, if Plaintiff could establish harassment, Intel could establish the reasonable care defense. *See id.*

At bottom, there is no dispute of material fact related to Plaintiff's workplace harassment claim. Summary judgment is therefore appropriate.

### E. Disability Discrimination under the ADA

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  Employers have a legal duty to reasonably accommodate the "known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). To set forth a prima facie disability discrimination claim, a plaintiff must establish that: "(1) he is disabled within the meaning of the ADA; (2) he is qualified (i.e., able to perform the essential functions of the job with or without reasonable accommodation); and (3) the employer terminated him because of his disability." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 433 (9th Cir. 2018).

Intel argues that Plaintiff cannot show Intel failed to engage in the interactive process with her or that her termination was pretext for disability-based discrimination.

(Doc. 45 at 17.)

Plaintiff concedes that she was granted a reasonable accommodation but argues that Intel's managers and workers ignored it. (Doc. 54 at 13.) According to Plaintiff, her coworkers "behavior made it almost impossible for [Plaintiff] to complete the Infinity Package and become L1 Ops certified" and thus their actions "set in motion a chain of events that led to her termination." (*Id.*) Plaintiff concludes by stating the "numerous disparaging comments" about her eyes by Mr. Bladt and Mr. Atkin "constitutes direct evidence of disability discrimination" precluding summary judgment. (*Id.*)

Put briefly, nothing on the record shows that Plaintiff suffered adverse employment action—i.e., termination—because of her dry eyes. Mr. Bladt, the manager instrumental in Plaintiff's termination, testified that Plaintiff never spoke with him about her ADA accommodation, no other employee ever brought it up, and his testimony reasonably implies that Plaintiff's disability played no role in the decision to terminate her after she could not meet the CAP. (Bladt Depo. at 79–83.) The only remaining "evidence" of Plaintiff's disability discrimination claim, therefore, are her own uncorroborated statements that coworkers gossiped about her condition, which somehow led to her termination.

At bottom, there is no dispute of material fact related to Plaintiff's disability discrimination claim. Summary judgment is therefore appropriate

## IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED granting** Intel's Motion for Summary Judgment. (Doc. 45).

**IT IS FURTHER ORDERED** vacating all future court dates and directed the Clerk of Court to enter judgment consistent with this Order and terminate this case.

Dated this 25th day of July, 2025.

Honorable Susan M. Brnovich
United States District Judge